Filed 10/22/21  AWI Builders v. Alliant Consulting CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| AWI BUILDERS, INC., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>ALLIANT CONSULTING, INC., et al.,<br><br>    Defendants and Respondents. | B294662, B297189,<br>B298699, B300834<br><br>(Los Angeles County<br> Super. Ct. No. BC696666) |

APPEAL from judgments and orders of the Superior Court for Los Angeles County, Robert B. Broadbelt III, Judge.  Affirmed.

Pacheco & Neach, Rod Pacheco, Brian Neach; Feldman & Associates, Inc., Mark A. Feldman, David J. Sire, Jr.; Richards, Watson & Gershon, Steven A. Nguy and T. Peter Pierce for Plaintiffs and Appellants.

Manning & Kass, Ellrod, Ramirez, Trester, Al M. De La Cruz and Ladell Hulet Muhlestein for Defendants and Respondents Alliant Consulting, Inc. and Christa Schott.

Koeller, Nebeker, Carlson & Haluck, William L. Haluck, Zachary M. Schwartz and Greg K. Koeller for Defendants and Respondents Anthony aka "Tony" Rackaukas, Donde McCament, Elaine Noce and County of Orange.

Collins Muir + Stewart LLP, Samuel J. Muir, Rebecca J. Chmura and David C. Moore for Defendant and Respondent GKK Works.

DeCarlo & Shanley, Desmond C. Lee and Yuliya S. Mirzoyan for Defendants and Respondents Carpenters-Contractors Cooperation Committee, Pete Rodriguez and David Kersh.

Division of Labor Standards Enforcement and David D. Cross for Defendants and Respondents State of California and Maria Sandoval.

—————————

This opinion addresses multiple appeals taken from orders granting, or granting in part, five special motions to strike the second amended complaint filed by plaintiffs AWI Builders, Inc. (AWI), Construction Contractors Corporation (CCC), Zhirayr "Robert" Mekikyan, and Anna Mekikyan, and from orders awarding attorney fees with respect to each of those motions.[1]  The second amended complaint alleged causes of action for violation of civil rights under section 1983 of title 42 of the United States Code (section 1983) as well as state tort claims against five sets of defendants:  (1) Alliant Consulting, Inc. (Alliant) and Christa Schott (collectively, the Alliant defendants); (2) County of Orange (OC), Anthony aka "Tony" Rackaukas, Donde McCament, and Elaine Noce (collectively, the OC

—————————

[1]  We ordered all of the appeals consolidated for purposes of oral argument and decision.

2

defendants); (3) GKK Works (GKK); (4) Carpenters-Contractors Cooperation Committee, Inc. (Quad-C), Pete Rodriguez, and David Kersh (collectively, the Quad-C defendants); and (5) the State of California (State) and Maria Sandoval (the State defendants).

The trial court granted in full the special motions to strike (also known as anti-SLAPP motions, brought under Code of Civil Procedure section 425.16 (hereafter section 425.16)) brought by the Alliant defendants, the OC defendants, GKK, and the Quad-C defendants and dismissed all claims against those parties. The court granted in part the State defendants' anti-SLAPP motion and dismissed all but the section 1983 claim against Sandoval.

On appeal from these orders and the orders awarding attorney fees to all of the defendants, plaintiffs raise numerous arguments as to why the anti-SLAPP statute does not apply to certain claims and how they established a probability of prevailing on some of the claims. We have considered all of those arguments, including those raised for the first time on appeal, and conclude the trial court did not err in granting the anti-SLAPP motions, and that the court conducted the proper legal analysis of the attorney fee motions and did not abuse its discretion in awarding fees to all defendants. Accordingly, we affirm all of the orders.

## BACKGROUND

A. *Preliminary Background Information*

Plaintiff AWI is a public works construction company. AWI is owned by plaintiffs Robert and Anna Mekikyan, who also own plaintiff

3

CCC, another construction company. In early 2013, AWI successfully bid on two public works projects for Riverside County (Riverside), and was awarded a $14 million contract for the rehabilitation of the Public Defender's building (the PD project) and a $13.5 million contract on a project known as the Riverside County Regional Medical Center (the Medical Center project). CCC was a subcontractor of AWI on the Medical Center project.

Riverside hired defendant GKK as a consultant to provide construction management services on both the PD project and the Medical Center project. Issues arose during construction on the PD project, and by the end of 2013, AWI made Riverside officials aware that it was contemplating litigation; AWI filed a government claim against Riverside in early 2014.

In late 2013 or early 2014, Riverside asked GKK to find a labor compliance specialist. After receiving bids for that work, GKK entered into subconsultant agreements with defendant Alliant to provide labor compliance services on the PD project, the Medical Center project, and another project that AWI previously had worked on. Alliant began to provide those services in January or March of 2014.[2]

The events at issue in this lawsuit originate with the retention of Alliant to provide labor compliance monitoring services. To put in

---

[2]    There is conflicting evidence regarding when Alliant began providing monitoring services with respect to the Riverside projects. Defendant Christa Schott, the president and sole owner of Alliant testified at one point that Alliant started its work on the projects in March 2014, and later testified that it started in January 2014. The date of the subconsultant agreement was April 14, 2014.

context the conduct of the various parties, an understanding of California's prevailing wage law is required.

B.    *The Prevailing Wage Law*

For more than 90 years, contractors and public entities involved in construction of public works in California have been governed by California's prevailing wage law (Lab. Code, §§ 1720-1861; originally enacted by Stats. 1931, ch. 397, p. 910).  This law was "enacted in response to the economic conditions of the Depression, when the oversupply of labor was exploited by unscrupulous contractors to win government contracts when private construction virtually stopped."  (*State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 294.)  The law furthers the declared "policy of this state to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation, and to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards."  (Lab. Code, § 90.5, subd. (a); see *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 985.)

The prevailing wage law provides that "[e]xcept for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and

overtime work fixed as provided in this chapter, shall be paid to all workers employed on public works." (Lab. Code, § 1771; see also Lab. Code, § 1774 ["The contractor to whom the contract is awarded, and any subcontractor under him, shall pay not less than the specified prevailing rates of wages to all workmen employed in the execution of the contract"].)

To ensure compliance with this requirement, the prevailing wage law requires each contractor and subcontractor on a public work project to "keep accurate payroll records, showing the name, address, social security number, work classification, straight time and overtime hours worked each day and week, and the actual per diem wages paid to each journeyman, apprentice, worker, or other employee employed by him or her in connection with the public work." (Lab. Code, § 1776, subd. (a).) The term "payroll records" is defined as "[a]ll time cards, cancelled checks, cash receipts, trust fund forms, books, documents, schedules, forms, reports, receipts or other evidences which reflect job assignments, work schedules by days and hours, and the disbursement by way of cash, check, or in whatever form or manner, of funds to a person(s) by job classification and/or skill pursuant to a public works project." (Cal. Code Regs., tit. 8, § 16000.)

The contractor must inform the body awarding the contract of the location of the payroll records and, as relevant here, those records must be "available for inspection at all reasonable hours at the principal office of the contractor" as follows: (1) they must be "made available for inspection or furnished upon request to a representative of the body awarding the contract and the Division of Labor Standards

Enforcement [DLSE] of the Department of Industrial Relations" (Lab. Code, § 1776, subd. (b)(2)); (2) they must be made available to the public if requested (although the request must be made through either the body awarding the contract or DLSE)[3] (Lab. Code, § 1776, subd. (b)(2)); and (3) "[n]otwithstanding any other provision of law, . . . law enforcement agencies investigating violations of law shall, upon request, be provided nonredacted copies" of the payroll records (Lab. Code, § 1776, subd. (f)(1)). These requirements to maintain the payroll records and allow inspection must be reflected in the contract for the public work. (Lab. Code, § 1776, subd. (i).)

The body that awarded the contract for a public work must "take cognizance of violations" of the prevailing wage law and must promptly report any suspected violations to the Labor Commissioner. (Lab. Code, § 1726, subd. (a).) If the awarding body determines as a result of its own investigation that there has been a violation, it may withhold contract payments after giving written notice to the contractor or subcontractor. (Lab. Code, §§ 1726, subd. (b), 1771.6, subd. (a).)

If the Labor Commissioner determines after an investigation that there has been a violation, he or she must issue a civil wage and penalty assessment to the contractor or subcontractor, or both. (Lab. Code, § 1741, subd. (a).) The assessment must be served not later than 180

---

[3]    The law includes measures to protect the privacy of employees when the payroll records are made available to the public. (Lab. Code, § 1776, subd. (e)). Those measures are less restricted when the member of the public requesting the records is a multiemployer Taft-Hartley trust fund (29 U.S.C. § 186(c)(5)) or a joint labor-management committee established under federal law. (*Ibid.*)

days after the filing of a valid notice of completion of the public work or 180 days after acceptance of the public work, whichever occurs last. (*Ibid.*) The amount of the assessment is based upon the difference between the prevailing wage and the amount actually paid to each worker, plus a penalty of not less than $40 (or $120, if the violation was willful) for each calendar day for each worker paid less than the prevailing wage. (Lab. Code, § 1775.) If an assessment is issued, the body that awarded the contract must, before making any further payments to the contractor, withhold and retain all amounts required to satisfy the assessment. (Lab. Code, § 1727, subd. (a).)

In addition to investigations by the awarding body, the Labor Commissioner, and law enforcement agencies, the prevailing wage law provides another avenue to enforce the law. Section 1771.2 of the Labor Code provides that "[a] joint labor-management committee established pursuant to the federal Labor Management Cooperation Act of 1978 (29 U.S.C. Sec. 175a) may bring an action in any court of competent jurisdiction against an employer that fails to pay the prevailing wage to its employees, as required by this article, or that fails to provide payroll records as required by [Labor Code] Section 1776."[4] (Lab. Code, § 1771.2, subd. (a).) Such an action may be commenced no later than 18 months after the filing of a valid notice of completion of the public work or 18 months after acceptance of the public work, whichever is later. (*Ibid.*)

---

[4]     It appears that defendant Quad-C may be a joint labor-management committee.

The consequences for contractors and subcontractors found to have committed violations of the prevailing wage law are not solely monetary. For example, the Labor Commissioner is required to maintain a public list of the names of each contractor and subcontractor who has been found to have committed a willful violation. (Lab. Code, § 1741, subd. (c)(1).) The contractor's or subcontractor's name remains on the list for a minimum of three years. (Lab. Code, § 1741, subd. (c)(3).) If the Labor Commissioner finds that a contractor or subcontractor is in violation of the prevailing wage laws with intent to defraud, that contractor or subcontractor, or any entity in which the contractor or subcontractor has any interest, is ineligible to bid on or be awarded a contract for, or to perform work as a subcontractor on, a public works project for a period of not less than one year or more than three years. (Lab. Code, § 1777.1, subd. (a).) If the contractor or subcontractor is found to have committed two or more separate willful violations, that ban is for three years. (Lab. Code, § 1777.1, subd. (b).) This ban also applies if a contractor or subcontractor fails to provide a timely response to a request by DLSE to produce certified payroll records in accordance with Labor Code section 1776 (after notice and time to correct). (Lab. Code, § 1777.1, subd. (c).)

Finally, the contractor or subcontractor who violates the prevailing wage law may be criminally prosecuted. If the contractor or subcontractor fails to maintain accurate payroll records or fails to make them open to inspection, he or she is guilty of a misdemeanor. In addition, a contractor or subcontractor "who takes, receives, or conspires with another to take or receive, for his or her own use or the

9

use of any other person any portion of the wages of any worker or working subcontractor, in connection with services rendered upon any public work is guilty of a felony." (Lab. Code, § 1778.)

With these provisions of the prevailing wage law in mind, we continue our summary of the facts of this case.

C.     *The Events Leading to the Present Dispute*

1.     *Alliant Begins Its Labor Compliance Work*

Immediately upon being retained as a labor compliance monitor for Riverside, Alliant, through its president Schott, conducted a full labor compliance audit review of the payroll and supporting forms that AWI had provided for the Medical Center project. Alliant issued its preliminary findings to Riverside, based upon Schott's audit, on March 31, 2014. Alliant reported it was apparent that AWI was using several subcontractors who were not on the original subcontractor list included in the bid paperwork, and that one of the listed subcontractors had its license suspended due to failure to comply with bonding requirements. Alliant also reported that multiple contractors appeared to be paying less than the prevailing wage, and that many contractors (including AWI) had missed a pre-determined wage increase for some of the trades. Finally, Alliant reported that many required forms, statements, and/or information were missing.

On April 3, 2014, Schott met with Robert Mekikyan to review labor law requirements regarding the Medical Center project. Schott explained her and Alliant's role, on behalf of Riverside, in assessing AWI's and CCC's compliance with labor laws, particularly the

10

prevailing wage law, with regard to Riverside's public works construction projects. Schott conducted a similar meeting with Mr. Mekikyan regarding the PD project on May 7, 2014. At both meetings, Schott provided to Mr. Mekikyan three-page checklists for AWI and for CCC setting forth labor law requirements applicable to each contract. Each checklist included a paragraph stating that contractors and subcontractors were required under Labor Code section 1776 to keep accurate payroll records and that those records "shall be made available for inspection at all reasonable hours at the principal office of the contractor/subcontractor . . . pursuant to Labor Code Section 1776." Each checklist was signed by the payroll officer for AWI or CCC. The payroll officers for both AWI and CCC also signed a "Certification of Understanding and Authorization" for both the Medical Center project and the PD project that, among other things, certified that the principals and the authorized payroll officers of AWI and CCC had read and understood the labor wage standards pertaining to each project, and would provide the documents required under the labor laws.[5]

---

[5] In addition, the contracts that AWI had entered into with Riverside for the PD project and for the Medical Center project had included, in accordance with Labor Code section 1776, subdivision (i), a provision stating: "The Contractor, and each subcontractor, shall keep an accurate record showing the names of and actual hours worked each calendar day and each calendar week by all laborers, workmen, and mechanics employed by them in connection with the Work contemplated by this Contract, which record shall be open at all reasonable hours to the inspection of the County or its officers or agents and to the Division of Labor Standards Enforcement of the Department of Industrial Relations."

11

As part of its labor compliance monitoring, Alliant went on site at both projects to interview workers. In early May 2014, Schott expressed concern to principals at GKK that the hours worked, classifications used, and total number of documented workers on site were not accurately reflected in AWI's payroll records. Therefore, she told GKK that she would issue a formal request for information to AWI to verify that all workers were being paid the appropriate prevailing wage.[6] In June 2014, Alliant made a formal request to AWI for copies of cancelled checks and time sheets for the Medical Center project; AWI refused to comply.

2. *Riverside Terminates Its Contract With AWI For the PD Project*

As noted, disputes arose in late 2013 between AWI and Riverside regarding the PD project, and AWI threatened litigation. Riverside retained GKK as a consultant to address the threatened litigation, assess Riverside's liability, and make recommendations. By mid-2014, Riverside concluded it was in its best interest, and in the best interest of the PD project, to pursue a termination for convenience with AWI. GKK subsequently was retained by Riverside to provide construction management services to facilitate the termination of AWI from the

---

[6] Schott also told GKK that she had been informed that the Riverside district attorney's office was pursuing criminal charges against Mr. Mekikyan and AWI. Apparently, Riverside deputy county counsel Marsha Victor had told Schott about the purported criminal investigation. It appears, however, that the Riverside district attorney's office did not start an investigation until April of 2015.

12

project and the transition to a new general contractor. AWI was removed from the PD project in late July 2014. However, AWI continued its work on the Medical Center project.

3.  *Alliant Obtains Documents From a Locked File Cabinet*

Alliant continued its labor compliance monitoring of AWI's Riverside projects. During one of Alliant's site visits to the Medical Center project, a worker approached Alliant employees and told them that all journeymen AWI workers were paid a flat hourly rate of $16 per hour, and that they worked 10 hours per day and most Saturdays but were not given any break periods or overtime pay. The worker also told the Alliant employees that AWI stored time sheets and daily sign-in sheets in its job trailer on site.

Schott consulted with Riverside deputy county counsel Marsha Victor regarding what could be done to obtain the payroll records AWI kept in its job trailer. After that consultation, on October 24, 2014, an Alliant employee and Chuck Waltman, an official from Riverside, went to the Medical Center project site trailer with a document scanner to scan the payroll records, including the time sheets and daily sign-in sheets, stored there. When they arrived, AWI staff called Mr. Mekikyan on the phone to tell him that Waltman and an Alliant employee were at the trailer and demanding documents. Mr. Mekikyan spoke on the phone with Waltman, and told him that Waltman did not have his permission to be in his office or to access the documents. Nevertheless, Waltman and the Alliant employee broke the lock on the

13

file cabinet in which the documents were stored, and scanned the documents on site.

Using the scanned documents, Alliant conducted a full audit, cross-referencing all of the hours reported on the time sheets and daily sign-in sheets to the certified payroll documents AWI had submitted to Riverside and/or Alliant. Alliant discovered that AWI had engaged in a substantial underreporting of hours and workers: many workers were not reported on the certified payroll documents, those documents reported four or eight hours of work when the time sheets showed the workers consistently worked 10 hours, and the certified documents did not report work performed on Saturdays and holidays even though the time sheets indicated work was performed on those days.

4. *Schott Files Complaints With the Labor Commissioner*

Based upon the information from the scanned documents, as well as an affidavit signed by an AWI worker stating that AWI workers were paid $16 per hour with no overtime pay, on November 20, 2014, Schott filed complaints with the Labor Commissioner regarding AWI's and CCC's violation of the prevailing wage law with respect to the Medical Center project. A few weeks later, in December 2014, Schott filed similar complaints against AWI and CCC with respect to the PD project.

All of the cases were assigned to Maria Sandoval, an investigator for the DLSE. Sandoval communicated directly with Schott, and Schott provided her with the information Alliant had obtained, including contact information for workers on the two projects. Sandoval reviewed

14

the records that Schott had provided; she also sent questionnaires to workers who were listed on AWI's certified payroll reports and interviewed those workers who responded. In mid-2015, the DLSE issued a civil wage and penalty assessment of more than $500,000 against AWI for the PD project; the issuance of the assessment allowed Riverside to withhold payments it owed to AWI under the contract. Schott continued to provide information to Sandoval about the Medical Center project, which was still ongoing.

AWI requested review of the PD project penalty assessment, and asked DLSE for copies of any documents DLSE relied upon in its determination to issue the assessment. Although a party against whom a civil wage and penalty assessment has been issued has a right to obtain copies of those documents, Sandoval's supervisor told Sandoval not to release the questionnaires.[7] Sandoval then contacted Schott to verify that DLSE could allow AWI to copy the documents Schott provided to Sandoval, including affidavits from workers, time sheets Alliant obtained from the job trailer, and pay stubs. Although Schott conceded that AWI was entitled under the prevailing wage law to look at the documents, she contacted Dan Stack with the Riverside district attorney's office to ask how she should respond Stack then went to see Sandoval, looked at the files she had, and instructed her that DLSE was

---

[7] Under the prevailing wage law, the DLSE is required during its investigation to keep confidential the name of, and any other information that may identify, any employee who reports a violation. (Lab. Code, § 1736.)

15

not to release the affidavits, questionnaires, and certain notes that contained the identity of complaining workers.

> 5. *Investigations of AWI by Quad-C and the Riverside and OC District Attorneys' Offices*

The DLSE was not the only agency investigating AWI's alleged labor law violations. On May 30, 2014, representatives of the Iron Workers Union brought to the OC district attorney's office forged labor documents relating to a public work project that AWI was constructing in OC (the OC Fair project). Shortly thereafter, defendant Donde McCament, a deputy district attorney in the Public Works Unit of the OC district attorney's office, and defendant Elaine Noce, an investigator for that office, initiated a criminal investigation into AWI's possible unlawful business practices relating to the OC Fair project. As part of that investigation, on December 17, 2014, Noce served a search warrant for the bank records of AWI, CCC, and the Mekikyans.

Sometime before March 2015, defendant Quad-C had begun an investigation into AWI's compliance with labor laws at the Medical Center project. According to defendant Pete Rodriguez, who worked for Quad-C, it was Quad-C's practice to conduct investigations into possible violations and take their findings to district attorneys' offices. Rodriguez had met Schott at a workshop and knew that she was working on the Medical Center project; they assisted each other in their

16

investigations by sharing information they had found regarding those violations.[8]

By March 2015, the Riverside district attorney's office also had begun its own investigation of AWI, CCC, and the Mekikyans. As part of that investigation, Riverside district attorney investigator Daniel Stack met with Schott to discuss AWI. Stack had told Schott to bring to their meeting any information she had about AWI; Schott brought Alliant's reports of action for the PD project and the Medical Center project.

At around the same time, Schott also met with McCament and Noce in the OC district attorney's office. By April 3, 2015, at the request of McCament and Noce, Schott was gathering information regarding workers at the PD project and Medical Center project who also worked at the OC Fair project. Riverside knew of, approved, and paid for Schott's work in assisting the OC district attorneys' office.

Over the next few months or more, Schott met several times with the Riverside and OC district attorney's offices, both separately and together. Rodriguez from Quad-C attended some of those meetings. In one of the early meetings, Schott and Rodriguez were asked to contact some of the workers at the Medical Center project to gather evidence regarding AWI's compliance with the prevailing wage law. One of the workers from whom Schott and Rodriguez sought to get information

---

[8] Rodriguez was better able to communicate with some of the workers because he spoke Spanish and Schott did not, although she had employees at Alliant who were native Spanish speakers.

17

was Todd Hawk, who had been the site superintendent on the PD project. On March 12, 2015, Schott wrote to Rodriguez that Hawk "collected and kept the workers time sheets and he knew EVERYTHING that [Mr. Mekikyan] was up to. For some reason however, [Mr. Mekikyan] takes care of him financially so [Hawk] won't talk though he has teased us that he may." Sometime later, Hawk (who had attended the meeting Schott had held with Mr. Mekikyan in May 2014 to review AWI's obligations under the prevailing wage law) provided documents to Alliant.

In July 2015, at the request of Riverside district attorney investigator Stack, Schott drafted a narrative for Stack to use to obtain a search warrant, which described the alleged scheme by Mr. Mekikyan, AWI, and CCC to violate the prevailing wage law. Schott had sent her first draft of the narrative to Rodriguez to have him give it more "oomph" because she had no experience drafting this kind of document. Rodriguez asked defendant David Kersh (also of Quad-C) for help; Kersh rewrote the draft, and Rodriguez forwarded it to Schott, who then forwarded it to Stack.

On October 6, 2015, the Riverside and OC district attorneys' offices jointly obtained search warrants for the Mekikyans' home and business locations; the search warrants were executed the following day. Schott continued to provide information regarding possible violations of the prevailing wage law to the OC district attorney's office at least through November 2016. The OC district attorney's office ultimately filed a civil complaint against AWI, CCC, and the Mekikyans

18

on February 20, 2018, for violations of state labor codes and unlawful, unfair, and fraudulent business practices.

## D. *The Complaint and Anti-SLAPP Motions*

AWI filed the original complaint in this action on March 8, 2018. The operative second amended complaint was filed on April 20, 2018, before any defendant had filed an answer or responsive pleading to the original or first amended complaints. The complaint alleged seven causes of action, as follows:

- First cause of action for violation of civil rights under section 1983, brought by the Mekikyans against all defendants except the State of California and OC, alleging that defendants conspired to create, cause, encourage or seek unlawful investigations and prosecutions by district attorney offices, and unlawful investigations and administrative prosecutions by DLSE.
- Second cause of action for violation of civil rights under section 1983, brought by the Mekikyans against OC (a *Monell* claim),[9] alleging that OC and its district attorney, defendant Rackaukas, failed to adequately train or supervise prosecutors to ensure they follow constitutional guarantees.
- Third cause of action for negligent interference with contractual relations, brought by all plaintiffs against all defendants, alleging interference with plaintiffs' contracts with Riverside, the State of

---

[9]     *Monell v. Department of Social Services* (1978) 436 U.S. 658 (*Monell*).

19

California, subcontractors, suppliers, bond companies, and owners of other construction projects.

- Fourth cause of action for negligent interference with prospective economic opportunity, brought by all plaintiffs against all defendants, alleging interference with plaintiffs' probable economic opportunities with respect to a variety of multi-million dollar construction projects.

- Fifth cause of action for intentional interference with contractual relations, brought by all plaintiffs against all defendants.

- Sixth cause of action for intentional interference with prospective economic opportunity, brought by all plaintiffs against all defendants.

- Seventh cause of action for negligent supervision, brought by all plaintiffs against GKK, alleging that GKK failed to monitor the activities and conduct of Alliant.

Each set of defendants filed special motions to strike under section 425.16. The trial court granted in full the motions filed by the Alliant defendants, the OC defendants, GKK, and the Quad-C defendants, and dismissed the complaint in its entirety as to those defendants. The court denied the State defendants' motion as to the section 1983 claim alleged against Sandoval and granted the motion as to the remaining claims alleged against both State defendants. Further details regarding the allegations of the complaint, the motions, and the trial court's rulings will be provided, as necessary, in the Discussion portion of this opinion.

## DISCUSSION

Plaintiffs do not challenge the trial court's rulings on the anti-SLAPP motions as to all claims and defendants. Instead, plaintiffs limit their challenges to the following:

- With respect to the first cause of action as alleged against the Alliant defendants, McCament, Noce, GKK, and the Quad-C defendants, plaintiffs contend that section 1983 claims are not subject to the anti-SLAPP statute. Plaintiffs also contend they established a probability of prevailing as to the Alliant defendants, McCament, Noce, and the Quad-C defendants.

- With respect to the second cause of action against OC, plaintiffs contend the conduct alleged is not protected under the anti-SLAPP statute.

- Plaintiffs do not challenge the court's rulings as to any defendant with respect to the third cause of action.

- With respect to the fourth, fifth, and sixth causes of action as against the State defendants only, plaintiffs contend the anti-SLAPP statute does not apply to the extent the claims are based upon the State defendants' withholding of information it relied upon in issuing the civil wage and penalty assessment.

- With respect to the fifth cause of action as against the Alliant defendants and GKK, plaintiffs contend they established a probability of prevailing.

- With respect to the seventh cause of action against GKK, plaintiffs contend their claim does not arise from conduct protected by the

21

anti-SLAPP statute and, in any event, they established a probability of prevailing.

In addition to these challenges, plaintiffs challenge an evidentiary ruling of the trial court with respect to the anti-SLAPP motions brought by the OC defendants, GKK, and the Quad-C defendants, in which the court sustained those defendants' objections to the admission of Schott's deposition testimony. Finally, plaintiffs challenge the awards of attorney fees to each set of defendants on three grounds: (1) section 1983 preempts the mandatory attorney fee provision of section 425.16; (2) the trial court failed to conduct the proper legal analysis; and (3) the trial court abused its discretion in awarding fees to the OC defendants for time spent reviewing their investigative records.

We begin our discussion with a brief summary of the law governing anti-SLAPP motions, then address the evidentiary ruling, followed by plaintiffs' contentions as to each of the challenged causes of action, and finally the award of attorney fees to each set of defendants.

A.    *Law Governing Anti-SLAPP Motions*

The anti-SLAPP statute "is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' (§ 425.16, subd. (b)(1).)" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884

22

(*Wilson*).) Such claims will be stricken "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

A special motion to strike may be directed at entire causes of action as pleaded in the complaint, or at specific allegations within a cause of action. As the Supreme Court explained in *Baral v. Schnitt* (2016) 1 Cal.5th 376, "[t]he anti-SLAPP procedures are designed to shield a defendant's constitutionally protected *conduct* from the undue burden of frivolous litigation. It follows, then, that courts may rule on plaintiffs' specific claims of protected activity, rather than reward artful pleading by ignoring such claims if they are mixed with assertions of unprotected activity." (*Id.* at p. 393.)

A special motion to strike involves a two-step process. First, the defendant bringing the motion must demonstrate that the plaintiff's claims arise from protected conduct in which the defendant has engaged. Second, if the defendant meets that burden, the burden shifts to the plaintiff to demonstrate that those protected claims "have at least 'minimal merit.'" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).)

"The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute. A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.' [Citation.] To determine whether a claim arises

23

from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' [Citation.] Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of "'act[s]'" protected by the anti-SLAPP statute." (*Wilson, supra*, 7 Cal.5th at p. 884.)

Those four categories of protected acts are found in subdivision (e) of section 425.16. That subdivision provides that an "'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

We review the trial court's determination on a special motion to strike de novo. Like the trial court, "'[w]e consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." [Citation.] However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true

24

the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' [Citation.]" (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 326.)

B. *Evidentiary Ruling*

In opposing each of the anti-SLAPP motions, the primary source of evidence plaintiffs relied upon in attempting to establish a probability of prevailing was the transcript of a deposition of Schott taken on January 17, 2017 and March 6, 2017 in a lawsuit AWI filed against Riverside. The OC defendants, GKK, the Quad-C defendants, and the State defendants objected to the consideration of Schott's deposition testimony, and the trial court sustained on hearsay grounds the objections of the OC defendants, GKK, and the Quad-C defendants. Therefore, the court did not consider the Schott testimony when ruling on those three motions. However, by the time the trial court ruled on the State defendants' motion, the California Supreme Court had decided *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, in which the Court held that a transcript of testimony given under oath, although hearsay, is admissible for purposes of prosecuting or opposing an anti-SLAPP motion. (*Id.* at pp. 943–944.) Accordingly, the trial court overruled the State defendants' objection to the Schott testimony.

In appealing from the orders granting the motions brought by the OC defendants, GKK, and the Quad-C defendants, plaintiffs contend the trial court prejudicially erred in refusing to consider Schott's

25

testimony, and that the court's orders should be reversed on this basis. While we agree the trial court erred in excluding Schott's testimony, we decline to reverse on this ground. Instead, in conducting our de novo review we will consider all of the evidence submitted by the parties, including the Schott testimony.

C.    *First Cause of Action* (*Section 1983 Claim*)

1.    *Step One: Applicability of Anti-SLAPP Statute*

In the first cause of action under section 1983, the Mekikyans alleged that the Alliant defendants, McCament, Noce, GKK, the Quad-C defendants, and Sandoval, acting under color of law through their participation and service as agents of law enforcement or government agencies, deprived plaintiffs of their constitutional rights by conspiring and acting to create, cause, encourage, or seek unlawful investigations and prosecutions by the OC and Riverside district attorneys' offices and the DLSE. In the trial court, plaintiffs argued that none of the claims alleged in the complaint, including the section 1983 claim, arose from conduct protected under the anti-SLAPP statute because the gravamen of their claims related to the defendants' soliciting and causing procurement of AWI's confidential and proprietary documents and their participation in strategy meetings, and therefore did not implicate any defendant's exercise of his or her constitutional rights to petition or free speech.

The trial court rejected plaintiffs' characterization of the basis for their claims, finding instead that, with respect to the section 1983 claim, all of the injury-producing conduct was undertaken as part of

criminal investigations or in connection with an issue under consideration in an official proceeding. Therefore, the court found that the section 1983 claim was subject to the anti-SLAPP statute under section 425.16, subdivisions (e)(2) and (e)(4).

On appeal, plaintiffs do not argue that their section 1983 claim does not arise from conduct that comes within scope of the anti-SLAPP statute. Instead, they argue that the anti-SLAPP statute cannot be applied to section 1983 claims at all because its application would affect plaintiffs' substantive federal rights. Plaintiffs acknowledge in their opening briefs that they did not raise this issue below, but they ask this court to exercise its discretion to consider this purely legal issue. We will do so. (*JKC3H8 v. Colton* (2013) 221 Cal.App.4th 468, 477 [noting that an appellate court may exercise its discretion to consider a new theory on appeal where the issue is one of law alone].) Unfortunately for plaintiffs, however, this new theory does not assist them.

The issue whether the anti-SLAPP statute applies to section 1983 claims filed in a California state court has been addressed in four published appellate opinions, the most recent of which was issued after plaintiffs had filed two of the four appellants' opening briefs in this matter. As that recent opinion explains, "[a]n analysis of whether to apply the anti-SLAPP statute to a federal claim [brought] in state court begins with the observations that the anti-SLAPP statute is a procedural law, rather than a substantive immunity [citations], and that a forum generally applies its own procedural law to cases before it. [Citation.] As such, the anti-SLAPP statute will apply to adjudication of a federal claim in state court unless either (1) 'the federal statute

provides otherwise' [citation], or (2) the anti-SLAPP statute 'affect[s] plaintiffs' substantive federal rights,' and is thus preempted." (*Patel v. Chavez* (2020) 48 Cal.App.5th 484, 487–488, italics omitted (*Patel*).)

As plaintiffs note in their opening briefs, and as the *Patel* court observed, the three prior cases to consider the issue addressed only the first possibility, relying only on the procedural versus substantive distinction and finding that nothing in section 1983 imposes federal procedural law upon state courts trying civil rights actions. (*Patel, supra*, 48 Cal.App.5th at p. 488, citing *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1117–1118; *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1392, fn. 4; *Tichinin v. City of Morgan Hill* (2009) 177 Cal.App.4th 1049, 1055–1056.) Plaintiffs' contention that the anti-SLAPP statute does not apply to section 1983 claims is based upon the second possibility, i.e., that the anti-SLAPP statute interferes with section 1983's operation in protecting a plaintiff's federal rights. Plaintiffs argue that that interference arises with respect to the award of attorney fees: while a prevailing defendant in a section 1983 case may recover attorney fees only in exceptional cases (see, e.g., *Herb Hallman Chevrolet, Inc. v. Nash-Holmes* (9th Cir. 1999) 169 F.3d 636, 645), the anti-SLAPP statute mandates an award of attorney fees to a prevailing defendant (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1141–1142 (*Ketchum*)). Thus, plaintiffs argue that the anti-SLAPP statute is preempted because it subjects section 1983 plaintiffs to liability for attorney fees they would not otherwise be required to pay.

28

We disagree. As plaintiffs note, whether a state procedural law applies to a federal claim in state court "turns on 'whether the state law purports to alter or restrict federally created rights.'" (Citing *Williams v. Horvath* (1976) 16 Cal.3d 834, 837.) But the anti-SLAPP statute's mandatory fee provision does not apply unless the plaintiff is unable to demonstrate that the federal claim he or she has alleged has "at least 'minimal merit'" (*Park, supra*, 2 Cal.5th at p. 1061), under a standard in which the court must accept as true the evidence favorable to the plaintiff and does not weigh credibility or compare the weight of the evidence (*Flatley v. Mauro, supra*, 39 Cal.4th at p. 326). In other words, the mandatory fee provision comes into play only after it has been established that the plaintiff's federal claim has no merit. And while we acknowledge that the specter of liability for the defendant's attorney fees might discourage some plaintiffs from bringing questionable claims that arise from a defendant's exercise of his or her constitutional right of petition or free speech, it cannot be said that the anti-SLAPP statute's mandatory fee provision alters or restricts section 1983's operation. Or, as the *Patel* court put it, the possibility that some plaintiffs might be discouraged from pursuing some section 1983 claims "does not rise to the level of defeating a plaintiff's ability to vindicate his [or her] federal rights through a section 1983 claim, particularly in light of the low bar plaintiffs must meet in order to save such claims and avoid attorney fees under the anti-SLAPP statute." (*Patel, supra*, 48 Cal.App.5th at p. 490.)

## 2. *Step Two: Probability of Prevailing*

We need not go into detail regarding plaintiffs' showing in the trial court, or the trial court's rulings, on step two of the anti-SLAPP motion procedure. Instead, we address only the arguments plaintiffs make on appeal.

As plaintiffs observe, "[t]o state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." (*American Mfrs. Mut. Ins. Co. v. Sullivan* (1999) 526 U.S. 40, 49–50.) Plaintiffs contend that the deprivation in the present case was committed under color of state law: they note that McCament and Noce of the OC district attorney's office do not dispute that they acted under color of state law, and argue that the Alliant defendants and the Quad-C defendants could be held liable under section 1983 as willful participants in joint action with the state or its agents. (Citing *Kirtley v. Rainey* (9th Cir. 2003) 326 F.3d 1088, 1092.) Plaintiffs also contend that all of these defendants deprived plaintiffs of their constitutional rights by violating the Fourth Amendment in two ways.

First, plaintiffs contend that by secretly collecting documents and other information to assist in the prosecution of plaintiffs, often at the request of McCament and Noce, the Alliant defendants and the Quad-C defendants (along with McCament and Noce) conducted unreasonable searches without plaintiffs' consent in violation of the Fourth Amendment. (Citing *U.S. v. Mazzarella* (9th Cir. 2015) 784 F.3d 532, 539–540.) Second, plaintiffs contend that McCament, Noce, and the

30

Alliant defendants committed a separate violation of plaintiffs' Fourth Amendment rights when an Alliant employee and a Riverside official (Waltman) entered AWI's business office at the Medical Center project and, despite Mr. Mekikyan's expressed denial of permission, scanned documents that were in a locked file cabinet. We find no violation of the Fourth Amendment in either instance.

The first clause of the Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." (U.S. Const., 4th Amend.) "This text protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." (*U.S. v. Jacobsen* (1984) 466 U.S. 109, 113.) The United States Supreme Court has "consistently construed this protection as proscribing only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" (*Ibid.*) Thus, a violation of this provision occurs only if an agent of the government conducts a warrantless search of materials or premises over which the possessor has a reasonable expectation of privacy. (*Maryland v. Macon* (1985) 472 U.S. 463, 469.)

In this case, even assuming that to the extent the Alliant defendants and Quad-C defendants obtained materials or information at the behest of the OC defendants or the Riverside district attorney's office they acted under color of law, plaintiffs had no reasonable

31

expectation of privacy over those materials or information.[10]  The evidence in the record is that the materials or information these defendant obtained consisted of the names and contact information of people who worked at the PD project site or the Medical Center project site, time sheets, daily sign-in sheets, cancelled checks showing the payments made to the workers, and other information related to the wages paid to workers at both sites.  In other words, defendants obtained "payroll records" as defined in section 16000 of the California Code of Regulations that, under Labor Code section 1776 and the contracts plaintiffs signed, plaintiffs were required to make available to Riverside and its agents (such as the Alliant defendants), law enforcement agencies (such as the OC and Riverside district attorneys' offices), and members of the public (such as the Quad-C defendants).  As such, plaintiffs had no reasonable expectation of privacy with respect to those materials and information.

Plaintiffs argue that even if they did not have a reasonable expectation of privacy over the payroll records, they presented evidence that at least some of the documents the Alliant defendants obtained

[10]    Moreover, to the extent plaintiffs assert that the Alliant defendants collected the information in that file cabinet at the behest of McCament and Noce, there is no evidence to support this assertion.  Instead, the evidence in the record establishes that McCament and Noce were unaware of the existence of any investigation of AWI in Riverside until at least December 16, 2014, two months after the Alliant defendants scanned the documents in the file cabinet, and that Schott did not meet or communicate with McCament or Noce until sometime around March of 2015.  Thus, there is no evidence to support the assertion that the Alliant defendants were acting under color of law with respect to this event.

were confidential, sensitive, or privileged. They also argue that Schott's admission in her deposition testimony that Alliant procured documents without consent by breaking into a locked cabinet establishes that there was an unlawful search of a business premises. Not so.

First, the only evidence plaintiffs offer to support their assertion that the Alliant defendants obtained confidential documents other than payroll records is the declaration by Mr. Mekikyan that plaintiffs filed in opposition to the Alliant defendants' anti-SLAPP motion. But that declaration states only that a supervisor with AWI (Hawk), had access to confidential, sensitive, and privileged documents regarding AWI and CCC, and that Mr. Mekikyan "[is] aware that" Hawk "sold [his] company's documents" to Schott and "stole documents from my companies and gave them to" the OC district attorney's office, Alliant, and the Quad-C defendants. Mr. Mekikyan does not explain how he became "aware" of Hawk's conduct, nor does he identify exactly what documents Hawk purportedly gave to any of the defendants.[11] Thus,

---

[11] In his declaration filed in opposition to GKK's anti-SLAPP motion (which was filed after the trial court had granted the Alliant defendants' anti-SLAPP motion), Mr. Mekikyan provided an additional detail. Although he still declared that he "[is] aware" that Hawk "sold [his] company's documents" to Schott, who then delivered them to the OC district attorney's office, the new declaration states that he "later became aware that Mr. Hawk stole documents, confidential bank and tax information included, from my companies and gave them to" the OC district attorney's office, Alliant, and the Quad-C defendants. The addition of "confidential bank and tax information" is insufficient to show that the documents included anything other than payroll records, since pay stubs and cancelled paychecks, which Schott admitted were some of the documents she obtained, would include bank and tax information.

the declaration does not provide evidence that any of the defendants gathered confidential material from Hawk.

Plaintiffs argue that even without Mr. Mekikyan's declaration, "[a] reasonable inference may be drawn that at least some of the documents gathered by Alliant were non-payroll records, to which [plaintiffs] had a reasonable expectation of privacy," because Schott never testified that Alliant gathered only payroll records. But a reasonable inference must have some basis in the evidence. (Evid. Code, § 600, subd. (b) ["An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action"].) And, while it is true that Schott never explicitly testified that Alliant gathered only payroll records, the only documents or information to which she referred in her testimony were payroll records; there was no testimony about the gathering of any non-payroll-related confidential information.

Second, even if Alliant acted under color of law when it obtained the time sheets and sign-in sheets from the locked cabinet in AWI's job site trailer (although it is clear that it did not do so at the behest of the OC district attorney's office, as explained in fn. 10, *ante*), there was no unlawful search. By accepting a public work construction job—and by signing the contract for the Medical Center project—AWI agreed to comply with Labor Code section 1776. That statute provides that payroll records "shall be available for inspection at all reasonable hours at the principal office of the contractor." (Lab. Code, § 1776, subd. (b).) Therefore, AWI did not have a reasonable expectation of privacy with

34

respect to its on-site office to the extent it was storing its payroll records there.

In short, because plaintiffs did not have a reasonable expectation of privacy with regard to payroll records or the office in which they were stored, the defendants' gathering of documents and other information did not constitute an unlawful search in violation of the Fourth Amendment. As this is the only conduct plaintiffs have identified on appeal as the basis for their section 1983 claim against the Alliant defendants, McCament, Noce, and the Quad-C defendants, their claim fails as a matter of law. Therefore, the trial court did not err in granting those defendants' anti-SLAPP motions with respect to that claim.

D.      *Second Cause of Action* (*Section 1983* <u>*Monell*</u> *Claim*)

1.      *Step One:  Applicability of Anti-SLAPP Statute*

The second cause of action alleges a section 1983 claim under *Monell*, *supra*, 436 U.S. 658, against OC for violation of the Mekikyan's civil rights. The cause of action includes several paragraphs alleging unethical behavior by defendant Rackaukas generally, as well as a failure to train his employees, which the complaint alleges established a custom of unethical behavior. The complaint then alleges that Rackaukas's and the OC district attorney's office's "failure to adequately train and or supervise prosecutors to ensure they follow constitutional guarantees such as due process, the Fourth Amendment right against unreasonable searches and seizures, and other rights of citizens, proximately caused the harm to Plaintiffs described herein."

In their anti-SLAPP motion, the OC defendants did not distinguish between the first cause of action and the second cause of action with regard to the first step of the anti-SLAPP analysis. Instead, they argued that plaintiffs' unlawful labor violations and business practices with regard to the OC Fair project was an issue under consideration and review by an executive body (the OC district attorney's office) and therefore the OC defendants' conduct and statements made during the investigation into plaintiffs' conduct was protected under subdivisions (e)(2) and (e)(4) of section 425.16. In granting the anti-SLAPP motion, the trial court also did not distinguish between the first and second (or the other) causes of action in the first step of its analysis. Instead, it found that the conduct upon which plaintiffs sought to hold the OC defendants liable was "the entire four-year criminal investigation into Plaintiffs' business practices as a whole and not a singular event that occurred during the course of the investigation. Therefore, the gravamen of Plaintiffs' claims against the County Defendants is actually the allegation that the County Defendants conspired with Schott (and others) to illegally investigate Plaintiffs' businesses for labor code violations in order to help both Riverside County and Orange County in avoiding payments to AWI for certain construction projects and in avoiding any legal repercussions from doing so."

On appeal, plaintiffs fault the OC defendants for failing to address in their motion how OC's alleged policy and custom of failing to adequately train and supervise prosecutors and employees qualifies as protected activity. Plaintiffs contend the trial court erred by following

36

the OC defendants' lead in lumping the failure to train and supervise allegations with the different and separate allegations of investigatory and prosecutorial misconduct asserted in the other causes of action. Plaintiffs assert that the allegations that OC failed to train and supervise are entirely separate from the allegations of investigatory and prosecutorial misconduct, and do not describe conduct protected by the anti-SLAPP statute. We disagree.

As noted, "[t]o determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.'" (*Wilson*, *supra*, 7 Cal.5th at p. 884.) In *City of Canton, Ohio v. Harris* (1989) 489 U.S. 378 (*City of Canton*), the United States Supreme Court explained what must be proved to establish a *Monell* claim: "a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.' Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. . . . [¶] In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." (*Id.* at pp. 389–390.)

In other words, the determination whether a municipality is liable under a *Monell* claim turns on the whether the specific constitutional violation alleged was the result of a training program that was "so likely to result in the violation of constitutional rights, that the

37

policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need [for more or different training]." (*City of Canton, supra,* 489 U.S. at p. 390.) Thus, plaintiffs' *Monell* claim cannot be established without a showing that (1) McCament's and Noce's investigation was conducted in accordance with OC's training program and (2) that the training program was so likely to result in the Fourth Amendment violations alleged here that OC can reasonably be said to have been indifferent to the need for more or different training. Therefore, for purposes of the first step analysis under the anti-SLAPP statute, the *Monell* claim arises, at least in part, on McCament's and Noce's conduct during their investigation in anticipation of criminal and/or civil prosecution of plaintiffs.

There cannot be any question that an investigation by a district attorney's office into possible unlawful or unfair business practices of a contractor on a public work project constitutes "conduct in furtherance of the exercise of the constitutional right of petition . . . in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4); cf. *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 784 [communications preparatory or in anticipation of litigation are protected by the anti-SLAPP statute]; accord, *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.) Therefore, we conclude plaintiffs' second cause of action for violation of civil rights under section 1983 arises from conduct protected by the anti-SLAPP statute.

38

2.      *Step Two:  Probability of Prevailing*

Plaintiffs do not separately challenge the trial court's ruling with regard to whether they established a probability of prevailing.  As discussed in Section C.2., *ante*, because plaintiffs did not have a reasonable expectation of privacy with regard to payroll records or the office in which they were stored, the defendants' gathering of documents and other information did not constitute an unlawful search in violation of the Fourth Amendment.  Therefore, plaintiffs' section 1983 claim necessarily fails, and we affirm the trial court's ruling granting the OC defendants' anti-SLAPP motion with regard to the second cause of action.

E.      *Fourth, Fifth, and Sixth Causes of Action With Respect to the State Defendants* (*Negligent and Intentional Interference With Prospective Economic Opportunity and Intentional Interference With Contract Claims*)

1.      *Step One:  Applicability of Anti-SLAPP Statute*

In their anti-SLAPP motion, the State defendants identified the allegations upon which plaintiffs' claims against Sandoval and the State were based, including allegations that Sandoval had withheld documents that AWI and CCC had requested.  The State defendants then argued that all of the claims were based upon conduct protected under subdivisions (e)(1) and (e)(2) of section 425.16 because the acts at issue "were made in connection with an official proceeding authorized by law."

In their opposition to the State defendants' motion, plaintiffs addressed the first step analysis as to all claims in a single paragraph. Plaintiffs argued that the anti-SLAPP statute does not protect claims "'arising from any act having any connection, however remote, with an official proceeding,'" and that the State defendants could not "fairly to be said to be exercising any constitutional right, including one that is captured by CCP § 425.16(e)(1) or (2)."

In finding that all of the claims were subject to the anti-SLAPP statute the trial court noted that plaintiffs failed to cite to evidence or the allegations of the complaint in support of their argument. The court also observed that plaintiffs did not dispute that the allegations against the State defendants were based upon the investigation by the DLSE, nor did plaintiffs dispute "that such conduct includes preparation of written or oral statements in furtherance of the DLSE investigation, including Sandoval's refusal to hand over documents requested by AWI and CCC."

On appeal, plaintiffs contend the trial court erred because their fourth, fifth, and sixth causes of action against the State defendants arose from the State defendants' conduct in withholding documents, and not from any written or oral statements. Therefore, plaintiffs argue that subdivisions (e)(1) and (e)(2) of section 425.16 do not apply because those subdivisions apply only to written or oral statements or writings. Plaintiffs also argue that the anti-SLAPP statute's catchall provision, subdivision (e)(4), does not apply because the State defendants had a mandatory duty to release the documents to AWI, and their failure to

do so was not in furtherance of any right of petition or free expression. We disagree.

First, we have held that the failure to disclose information in connection with an official proceeding falls within section (e)(2) of the anti-SLAPP statute. (*Suarez v. Trigg Laboratories, Inc.* (2016) 3 Cal.App.5th 118 (*Suarez*).) In *Suarez*, the plaintiff had entered into an agreement with the defendant business and its owner to provide business consulting services at a set hourly rate. After several months the parties orally agreed to expand the scope of the work, for which the plaintiff would receive, among other compensation, a percentage of any sale of the defendant business. (*Id.* at p. 120.) The relationship between the parties broke down, and the defendant terminated the plaintiff's employment. The plaintiff then sued the defendant business for quantum meruit to recover the fair value of the services he had rendered. (*Id.* at p. 121.) While settlement negotiations were going on in that case, the owner of the defendant business learned that a prospective investor intended to submit a letter of intent to purchase the business, and the owner instructed the parties involved to communicate only with his attorney in order to "keep the contents [of the letter of intent] within attorney client privilege" for purposes of the quantum meruit lawsuit. (*Ibid.*) Shortly thereafter, the plaintiff, who was unaware of the potential sale of the business, agreed to settle the quantum meruit case. (*Ibid.*)

When the plaintiff later learned that the defendant had concealed the letter of intent from him, he filed another lawsuit against the defendant seeking to rescind the settlement agreement based upon the

defendant's fraudulent concealment of the prospects for sale of the business. (*Suarez, supra,* 3 Cal.App.5th at pp. 121–122.) The defendant filed an anti-SLAPP motion, asserting that the plaintiff's claims arose out of communications that took place during the course of the quantum meruit action. The trial court granted the motion, and the defendant appealed, arguing that the plaintiff's claims were not premised on the defendant's statements, but rather on its active concealment and nondisclosure of the letter of intent. (*Id.* at pp. 122–124.)

We affirmed the trial court's ruling. We noted that in *Navellier v. Sletten* (2002) 29 Cal.4th 82 (*Navellier*), the Supreme Court examined whether the anti-SLAPP statute applied to an action alleging misrepresentations and failure to disclose. (*Suarez, supra,* 3 Cal.App.5th at pp. 123–124.) In that case, the defendant failed to disclose that he was not in agreement with the terms of a release in a federal action, and that failure to disclose induced the plaintiffs to file an amended federal action; the defendant then claimed that he did not, and did not intend to, release his claims. (*Navellier, supra,* 29 Cal.4th at p. 89.) The Supreme Court found that the defendant's conduct in the negotiation and execution of the release—his "acts (or omissions)"—fell within subdivision (e)(2) of the anti-SLAPP statute. (*Id.* at p. 90.)

We observed that the Supreme Court's finding "is consistent with established free speech jurisprudence," which holds that the right to free speech "encompasses what a speaker chooses to say, and what a speaker chooses not to say." (*Suarez, supra,* 3 Cal.App.5th at p. 124.)

42

Therefore, we held that the defendant's failure to disclose the letter of intent was protected under subdivision (e)(2) of the anti-SLAPP statute. (*Id.* at p. 125.) The Third District relied upon this holding in *Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757 (*Crossroads*), in reversing the trial court's denial of an anti-SLAPP motion as to a claim arising from the defendant's failure to provide information the plaintiff had requested in a bankruptcy case. (*Id.* at p. 779.) The appellate court had ruled in a prior opinion[12] that the claim did not arise from protected activity, finding that a defendant's silence was not protected under the express language of the anti-SLAPP statute. But by the time the court reconsidered the appeal, we had issued our decision in *Suarez*. Relying upon our decision and the Supreme Court's decision in *Navellier*, the Third District held that "failure to disclose can be protected petitioning activity for purposes of . . . section 425.16." (*Crossroads, supra,* 13 Cal.App.5th at p. 779, fn. 9.)

Plaintiffs do not address these cases in their briefs. Instead, they rely upon *Swanson v. County of Riverside* (2019) 36 Cal.App.5th 361 (*Swanson*) to argue that subdivisions (e)(1) and (e)(2) of section 425.16 do not apply to non-communicative conduct such as the withholding of documents. *Swanson* is distinguishable. In that case, an individual was taken by the police to a county medical center for an involuntary 72-hour hold under Welfare and Institutions Code section 5150. The

---

[12] The Supreme Court had granted review of the case, depublished the original opinion, and transferred the matter back to the appellate court to reconsider the appeal in light of *Baral v. Schnitt, supra,* 1 Cal.5th 376.

medical center released him before 72 hours had elapsed, and he returned home, where he bludgeoned three people to death. Surviving family members sued the county for negligence, and the county filed a special motion to strike under the anti-SLAPP statute. (*Swanson, supra*, 36 Cal.App.5th at p. 364.) The trial court denied the motion, and the appellate court affirmed.

The appellate court rejected the county's contention that the plaintiffs' claim arose from the county's evaluation and recommendation that the individual be discharged, which the county asserted was a statement made in an official proceeding. (*Swanson, supra*, 36 Cal.App.5th at p. 372.) The court observed that the plaintiffs "have not sued the County because of the substance of statements made in connection with the [72-hour hold] procedures. They have sued the County to challenge as negligent the decision to release [the individual] before the expiration of 72 hours. Thus, the gravamen of the complaint is negligence. [¶] . . . There is nothing in the County's decision to release [the individual] before the 72-hour hold that implicates the rights of free speech or petition." (*Id.* at p. 373.) Therefore, the court held that the plaintiffs' claims did not arise from conduct protected by the anti-SLAPP statute. (*Ibid.*)

Plaintiffs here describe the *Swanson* court's holding as turning on the distinction between conduct and speech, and attempt to analogize the circumstances in *Swanson* with the circumstances in the present case, arguing that plaintiffs' claims "arise from Sandoval's unlawful *conduct* in withholding documents—not from any written or oral

44

statements." Their analogy is inapt. The court in *Swanson* did not base its holding on the distinction between conduct and speech. Instead, it found the anti-SLAPP statute did not apply because the plaintiffs' claims were based upon the county's negligence in its medical treatment. *Swanson* does not assist plaintiffs here, where the claims arose from Sandoval's withholding of documents in the course of an official proceeding. That conduct is protected under subdivision (e)(2) of the anti-SLAPP statute, as explained in *Crossroads*, *Suarez*, and *Navellier*.

But even if that subdivision did not apply, we conclude that the conduct at issue is protected under the catchall provision of section 425.16, subdivision (e)(4).

We note that plaintiffs did not argue in the trial court that this provision did not apply. Nevertheless, plaintiffs ask that we exercise our discretion to consider their argument on appeal, since it raises a question of law. Inasmuch as it was the State defendants' burden to establish that the causes of action arose from conduct protected by the anti-SLAPP statute, but they failed to address whether the conduct at issue came within the catchall provision, we will address plaintiffs' argument.

In arguing that subdivision (e)(4) of the anti-SLAPP statute does not apply, plaintiffs rely upon *Anderson v. Geist* (2015) 236 Cal.App.4th 79 (*Anderson*). In that case, the plaintiff alleged that deputies of the San Bernardino Sheriff's Department unlawfully entered her home to attempt to execute a bench warrant that had been recalled and, in the

45

process, made defamatory statements to the plaintiff's neighbors. (*Id.* at p. 82.) The plaintiffs filed a lawsuit against the defendants alleging various claims arising from the deputies' allegedly unlawful conduct. The defendants filed an anti-SLAPP motion, which the trial court denied, finding that the defendants failed to support their motion with affidavits or declarations, and that the defendants failed to show that the action arose from an act in furtherance of the defendants' right of petition or free speech. (*Id.* at p. 84.)

The appellate court affirmed. The court explained: "Execution of an arrest warrant is of course 'an act in furtherance of a criminal prosecution,' as defendants put it. But that does not necessarily make it 'conduct in furtherance of the exercise of the constitutional right of petition' in the meaning of section 425.16, subdivision (e)(4). At base, the execution of a warrant is not an exercise of rights by the peace officer; it is the performance of a mandatory duty, at the direction of the court. [Citation.] Because peace officers have no discretion in whether or not to execute a warrant issued by the court, it seems unlikely that a lawsuit asserting claims arising from such activity could have the chilling effect that motivated the Legislature to adopt the anti-SLAPP statute, or that extending protections of the anti-SLAPP statute to such activity would serve the statute's goals. [Citation.] [¶] Moreover, to qualify for protection under section 425.16, subdivision (e)(4), the conduct at issue must be 'in connection with a public issue or an issue of public interest'—that is, it must 'concern[] a topic of widespread public interest and contribute[] in some manner to a public discussion of the topic.' [Citation.] In their briefing on appeal, defendants fail to make

46

any argument as to why their execution of a warrant in the circumstances of this case—a routine misdemeanor warrant in a case that apparently attracted precisely zero public interest or discussion—might meet this standard, and we find nothing in the record that might support an argument to that effect." (*Anderson*, *supra*, 236 Cal.App.4th at pp. 86–87.)

*Anderson* is distinguishable. In contrast to that case, in the present case Sandoval withheld documents during the course of an administrative proceeding in which she was a representative of one of the parties, i.e., the DLSE, an agency of the State, and thus was part of the petitioning conduct. The determination of what documents should be withheld involved some exercise of discretion, since DLSE is required under Labor Code section 1736 to keep confidential any information that may identify any employee who reported a violation. Thus, unlike in *Anderson*, it is likely that a lawsuit asserting claims arising from the exercise of that discretion as part of the petitioning process could have the chilling effect the Legislature sought to eliminate by enacting the anti-SLAPP statute. Finally, while the execution of the warrant in *Anderson* was done in connection with a case that had no relation to any public issue, the withholding of documents in the present case was done in connection with an administrative proceeding involving an important public issue, i.e., the violation of labor laws by contractors on a public work project. In short, we hold that plaintiffs' state tort claims based upon the State defendants' withholding of documents are protected by subdivision (e)(4) of the anti-SLAPP statute.

## 2.    *Step Two:  Probability of Prevailing*

Plaintiffs do not challenge the trial court's ruling as to step two of the anti-SLAPP analysis, relying solely on their assertion that the anti-SLAPP statute does not apply.  Accordingly, having found that the statute does apply, we affirm the trial court's ruling granting the State defendants' anti-SLAPP motion as to the fourth, fifth, and sixth causes of action.

## F.    *Fifth Cause of Action With Respect to the Alliant Defendants and GKK (Intentional Interference With Contract Claim)*

Plaintiffs do not challenge the trial court's ruling that the fifth cause of action with respect to the Alliant defendants and GKK arose from protected activity under the anti-SLAPP statute.  Therefore, we will address only the court's ruling that plaintiffs failed to establish a probability of prevailing on the fifth cause of action for intentional interference with contractual relations against those defendants.

In the fifth cause of action, plaintiffs alleged that defendants knew or had reason to know that plaintiffs had valid contracts with Riverside and the State, as well as "existing contractual relations with numerous other entities, including but not limited to subcontractors, suppliers, bond companies, and the owners of construction projects within the counties of Riverside, Orange and Los Angeles."  The complaint alleged that defendants intentionally disrupted "the contractual relationships," which damaged plaintiffs.

The complaint did not identify exactly which contracts allegedly were disrupted and caused damage to plaintiffs.  Nor did plaintiffs

identify those contracts in their oppositions to the Alliant defendants' and GKK's anti-SLAPP motions. In their opening brief on appeal from the trial court's ruling on those motions, however, plaintiffs identify AWI's contract for the PD project as the contract with which the Alliant defendants and GKK interfered.

Plaintiffs contend they established a probability of prevailing against the Alliant defendants because they presented evidence that Alliant and Schott knew of the existence of the contract for the PD project and "set out to disrupt the contractual relationship between AWI and Riverside" by gathering documents from AWI without Mr. Mekikyan's knowledge, falsely advising GKK (the project manager) that the Riverside district attorney's office was pursuing criminal charges against Mr. Mekikyan and AWI, interacting directly with Riverside instead of communicating through GKK, and visiting the PD project site 10 to 15 times between May and July of 2014, when AWI was terminated from the project. Plaintiffs contend this evidence—along with evidence purportedly showing that Schott had an incentive to see AWI replaced with a new contractor—shows that Alliant and Schott's actions "were designed to induce Riverside to terminate its contract with AWI on the PD Office Project." And, since they presented evidence that Riverside terminated its contract with AWI in July 2014 and that as a result AWI lost future revenue under the contract, plaintiffs contend they established that Alliant and Schott intentionally interfered with AWI's contract with Riverside for construction of the PD project.

With regard to GKK, plaintiffs contend that as Alliant's employer on the PD project, GKK was vicariously liable for intentional interference with the contract under the rule of respondeat superior. They assert they established a probability of prevailing against GKK because they presented evidence that GKK employed Alliant and oversaw its performance of labor compliance services on the PD project and was responsible for Alliant's actions; since Schott's interference with the PD project was foreseeable, GKK was liable for that interference under the rule of respondeat superior.

The fault in plaintiffs' argument is that even assuming the evidence submitted was sufficient to establish intentional interference with the PD contract, the statute of limitations barred their claim. The statute of limitations for an intentional interference with contractual relations claim is two years. (Code Civ. Proc., § 339(1); *Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 408.) "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.'" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*.) The elements of a cause of action for intentional interference with contractual relations are: "'(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55.) In the present case, the cause of action was complete when the contractual relationship was disrupted, which immediately caused the alleged

50

damages.  That occurred in July 2014, when Riverside terminated its contract with AWI for the PD project.  Plaintiffs did not file the original complaint in this action until March 2018, more than four years after that termination.

Plaintiffs contend, however, that the statute of limitations does not bar their claim because of the discovery rule.  Under the discovery rule, accrual of a cause of action is postponed "until the plaintiff discovers, or has reason to discover, the cause of action.  [Citations.]  [¶] A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'"  (*Fox, supra*, 35 Cal.4th at p. 807.)  The California Supreme Court has explained that "by discussing the discovery rule in terms of a plaintiff's suspicion of 'elements' of a cause of action, it was referring to the 'generic' elements of wrongdoing, causation, and harm.  [Citation.]  In so using the term 'elements,' we do not take a hypertechnical approach to the application of the discovery rule.  Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them."  (*Ibid.*)  Once becoming aware of an injury, "plaintiffs are required to conduct a reasonable investigation . . . and are charged with knowledge of the information that would have been revealed by such an investigation." (*Id.* at p. 808.)

Here, plaintiffs were aware of the injury when Riverside terminated the PD project contract in July 2014, or at the latest when Schott filed her complaint against AWI regarding the PD project in

51

December 2014. They contend, however, they were not aware of the alleged wrongdoing until March 2017, when Schott was deposed in the lawsuit AWI brought against Riverside. In support of this contention, they point to the declaration of Mr. Mekikyan, in which he stated that he was not aware of the involvement of the Riverside and OC district attorneys' offices investigations or of Schott's assistance or true intentions until that deposition. But the fifth cause of action (as described in the appellants' opening brief) was based upon the Alliant defendants' and GKK's alleged interference with the PD project contract, and the evidence establishes that the Riverside and OC district attorneys' offices did not contact Schott until around March of 2015, *after* the PD project contract was terminated. Thus, the district attorneys' investigations, and Schott's assistance with those investigations, played no part in the termination of the PD project contract. Accordingly, the discovery rule does not apply to postpone the accrual of plaintiffs' fifth cause of action against the Alliant defendants and GKK.

G.    *Seventh Cause of Action (Negligent Supervision Claim)*

1.    *Step One: Applicability of Anti-SLAPP Statute*

In their seventh cause of action, plaintiffs alleged that GKK had a duty to supervise and monitor the activities and conduct of Alliant, and that GKK breached that duty by negligently failing to adequately supervise Alliant, which caused plaintiffs injury. GKK did not directly address these allegations in the first step of its analysis in its anti-SLAPP motion, instead arguing that "all of GKK's alleged actions in the

[complaint] were part of the County of Riverside's pre-litigation consulting activities and are therefore protected."

In their opposition to the motion (which was filed shortly after the trial court granted the Alliant defendants' anti-SLAPP motion), plaintiffs also fail to directly address the allegations of the seventh cause of action. Instead, plaintiffs simply stated that "[t]he gravamen of the [entire complaint] is that GKK improperly and negligently supervised its agent, Alliant," then quoted (without any analysis) from a variety of cases in which courts cautioned that the anti-SLAPP statute does not apply in all cases in which the First Amendment is implicated or in which there is any connection with an official proceeding.

In its reply brief, GKK noted plaintiffs' attempt to recharacterize the complaint as arising from GKK's alleged negligent supervision. It argued that all of the conduct alleged involved "speech and acts" concerning an issue under consideration by a legislative body (Riverside's investigation into plaintiffs' labor practices) and "a matter made open to the public that concerns an issue of public interest" (including the expenditure of taxpayer dollars and the public interest in overseeing the appropriation of public funds), and therefore all claims arose from conduct protected by the anti-SLAPP statute. (Citing § 425.16, subds. (e)(1) to (e)(4).) GKK specifically argued that its "conduct in their relationship with ALLIANT . . . is protected activity under [subd. (e)(4) of § 425.16]."

Addressing the seventh cause of action in its order granting GKK's motion, the trial court noted that the negligent supervision claim

53

was based upon different conduct by GKK than the other claims. The court agreed with GKK's assertion in its reply brief that the negligent supervision claim arose from GKK's acts and omissions in furtherance of petitioning activity, i.e., a governmental investigation into AWI's labor practices. The court therefore found that GKK met its burden to show that all causes of action alleged against it arose from conduct protected under subdivisions (e)(2) and (e)(4) of the anti-SLAPP statute.

On appeal, plaintiffs argue that neither subdivision applies to their negligent supervision claim because that claim "arises from the financial injury [plaintiffs] incurred as a result of GKK failing adequately to supervise Alliant and Schott under their contract. . . . GKK's failure to do so is not a matter of public concern." Plaintiffs point to the Supreme Court's decision in *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610 (*Rand*), in which Rand Resources (Rand) had been hired by the City of Carson as the city's exclusive agent to negotiate with the National Football League (NFL) about the possibility of building a football stadium in the city. After the city replaced Rand with a different developer, Rand sued the city, its mayor, and the rival developer. (*Id.* at p. 614.) The complaint included allegations that the rival developer and the mayor exchanged confidential emails to discuss matters relating to building a stadium in the city, that the mayor regularly sent the rival developer confidential city documents related to the development of a stadium, and that the mayor and the rival developer were involved in discussions regarding how to get around the city's agreement with Rand. The complaint also alleged that the rival developer, with the knowledge and support of the city and its mayor,

54

contacted NFL representatives and purporting to be an agent of the city with respect to bringing an NFL franchise to the city. (*Id.* at p. 618.)

Examining Rand's claims for tortious breach of contract and fraud, the Supreme Court noted that the crux of those claims was that the defendants concealed and affirmatively lied about the city's breach of the exclusivity provision in its agreement with Rand. Rand alleged that the mayor and rival developer conspired to conceal that breach by meeting in secret, exchanging confidential emails, and other conduct, and that the mayor and other defendants made affirmative misrepresentations regarding their knowledge of the rival developer's activities and the status of the city's agreement with Rand. (*Rand, supra*, 6 Cal.5th at p. 622.) The Supreme Court found that although the claims arose from the defendants' statements, those statements were not made in connection with an issue before the city council (and thus were not protected under subd. (e)(2) of § 425.16) or an issue of public interest (and thus not protected under subd. (e)(4)).

Addressing subdivision (e)(4), the court stated: "[T]he parties agree that building an NFL stadium in the City is a matter of public interest. But defendants' speech concerned only the narrower issue of *who* should represent the City in the negotiations with the NFL. The affirmative misrepresentations, for instance, concerned only the falsehoods that [the mayor] did not know [the rival developer] and was not aware of his involvement in the NFL negotiations, and that the City would continue to let Rand be its exclusive agent if his company made 'reasonable progress.' Neither of these statements was directed to the public issue of whether to 'hav[e] an NFL team, stadium, and associated

developments in Carson' or what trade-offs might be entailed in the process. [Citation.] Rather, what [the mayor and another defendant] misrepresent—the issue 'in connection with' their statements—was the identity of the City's agent in negotiations with the NFL." (*Rand, supra*, 6 Cal.5th at p. 623.)

In rejecting the defendants' argument that "the issue of who served as the City's agent was a matter of public significance because 'the better the negotiating party, the more likely that an NFL stadium would be delivered,'" the court "reject[ed] the proposition that any connection at all—however fleeting or tangential—between the challenged conduct and an issue of public interest would suffice to satisfy the requirements of section 425.16, subdivision (e)(4). [Citations.] [¶] At a sufficiently high level of generalization, any conduct can appear rationally related to a broader issue of public importance. What a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern." (*Rand, supra*, 6 Cal.5th at p. 625.)

Seizing upon this language, plaintiffs here argue that although "GKK's failure to properly supervise Alliant and Schott has at a very general level some connection to the assertedly public issue of the investigation of AWI[,] . . . the specific conduct being challenged— GKK's negligence in shirking its supervisorial duties—is not itself an issue of public interest." Plaintiffs, however, take an overly specific view of the conduct being challenged. To be sure, the conduct alleged was GKK's purported negligent supervision. But what GKK was

supervising was the investigation into violations of labor laws by a contractor on public works projects. By supervising, GKK was participating—albeit negligently (allegedly)—in the investigation itself—an investigation preparatory to filing administrative claims against AWI and CCC. Therefore, plaintiffs' claim for negligent supervision arose from GKK's petitioning conduct "in connection with a public issue." (§ 425.16, subd. (e)(4).)

2. *Step Two: Probability of Prevailing*

Plaintiffs contend they established a probability of prevailing because they submitted evidence that GKK allowed Alliant to operate without any oversight, which allowed Alliant and Schott to (1) obtain information from AWI without Mr. Mekikyan's knowledge; (2) take documents from AWI's office without permission or a warrant; (3) provide AWI documents to the OC district attorney's office without a warrant; (4) provide information to the OC and/or Riverside district attorneys' offices for those offices to obtain search warrants; (5) file complaints with DLSE and then urge DLSE not to release certain documents when AWI requested them; (6) exaggerate the magnitude of AWI's wage violations to the OC district attorney's office; and (7) misrepresent to the OC district attorney's office that AWI prohibited Schott from talking to AWI's subcontractors.

As discussed in Section C.2., *ante*, in light of the prevailing wage law, there was nothing improper in Alliant or Schott obtaining information from AWI's payroll records, whether as part of her investigation on behalf of Riverside or as an agent of the OC and/or

57

Riverside district attorneys' offices. With regard to the alleged exaggeration or misrepresentation to the OC district attorney's office, there was no evidence presented to suggest that those statements were acted upon or caused any damage to plaintiffs. Finally, while there is evidence that Sandoval from the DLSE contacted Schott to ask whether DLSE should allow AWI to copy certain documents that Schott had provided to DLSE, there is no evidence to show that *GKK's alleged failure to supervise* Alliant or Schott caused plaintiffs harm due to DLSE's withholding of documents. The evidence shows that at the time Sandoval contacted Schott, Schott (at Riverside's direction) was assisting the Riverside district attorney's office with its own investigation of AWI. The evidence also shows that immediately after Sandoval contacted Schott, Schott contacted Riverside district attorney investigator Stack to ask him to respond to Sandoval's question, and Stack then went to the DLSE to look at the documents to determine if the release of those documents might jeopardize the case against AWI. Thus, to the extent Schott participated in DLSE's decision to withhold documents from AWI, it was the Riverside district attorney's office, rather than Schott, that made the determination whether to recommend withholding them.

In short, plaintiffs failed to present evidence sufficient to establish a probability of prevailing on the negligent supervision claim, i.e., evidence to show that GKK's alleged failure to properly supervise Alliant and Schott caused injury to plaintiffs. Accordingly, we affirm the trial court's ruling granting GKK's anti-SLAPP motion with regard to the seventh cause of action.

H.    *Attorney Fee Awards*

Following the granting of their anti-SLAPP motions, each group of defendants filed motions for attorney fees under section 425.16.  The Alliant defendants sought $227,180 in fees; the trial court awarded $85,155.  The OC defendants sought $93,445; the trial court awarded $71,655.  GKK sought $70,460.30; the trial court awarded $39,577.  The Quad-C defendants sought $114,375.33 for the anti-SLAPP motion and $15,475 for the fee motion; the trial court awarded a total of $77,673.60 for both motions.  And the State defendants sought $11,087.50; the trial court awarded $6,037.55.

Plaintiffs appeal from all five orders.  With respect to all of the orders, plaintiffs argue that mandatory fee provision set forth in section 425.16, subdivision (c) is preempted by federal law when applied to a section 1983 cause of action.  With respect to all of the orders except the one awarding fees to the State defendants, plaintiffs argue the trial court did not apply the proper legal test in evaluating the fee motions because the court failed to determine whether the fees related to duplicative legal arguments in several of the anti-SLAPP motions should have been significantly reduced.  Finally, plaintiffs contend the trial court erred by awarding fees to the OC defendants for time spent reviewing thousands of pages of investigative records, arguing that that effort was completely unnecessary to the legal arguments those defendants asserted in their anti-SLAPP motion.  We address each argument in turn.

1.   *Federal Preemption*

Plaintiffs' argument that federal law preempts application of the anti-SLAPP statute's mandatory fee provision to a section 1983 claim is, like plaintiffs' argument that the anti-SLAPP statute does not apply to section 1983 claims at all, raised for the first time on appeal.  Because it is a pure question of law, we will exercise our discretion to consider it.

As we discussed in Section C.2., *ante*, as a procedural law, the anti-SLAPP statute (including its attorney fee provision) applies to the adjudication of a federal claim brought in state court "unless either (1) 'the federal statute provides otherwise' [citation], or (2) the anti-SLAPP statute 'affect[s] plaintiffs' substantive federal rights,' and is thus preempted." (*Patel, supra*, 48 Cal.App.5th at p. 488.)  Plaintiffs concede that federal law provides no express basis to exempt a section 1983 claim from application of the anti-SLAPP statute.  However, they argue that the mandatory fee provision of the anti-SLAPP statute affects plaintiffs' substantive federal rights.

As plaintiffs observe, the United States Supreme Court has held that a defendant who prevails on a section 1983 claim may recover his or her attorney fees under section 1988 of title 42 of the United States Code (section 1988) "only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 429, fn. 2.)  Plaintiffs contend that the anti-SLAPP statute's mandatory fee provision is preempted by federal law because it "undermines entirely Congress' remedial regime for Section 1983 violations" because a defendant is automatically entitled to attorney fees without having to show that plaintiffs' section 1983 claim was

objectively frivolous. Plaintiffs also contend the mandatory fee provision affects plaintiffs' federal rights and thus is preempted because it strips courts of the discretion that section 1988 provides to deny fees to defendants who prevail on section 1983 claims. We are not persuaded.

What plaintiffs' arguments ignore is that defendants who prevail on an anti-SLAPP motion against a section 1983 claim are not awarded attorney fees because they prevailed on a section 1983 claim. They are awarded fees to compensate them for defending against a meritless claim brought by a "party seeking to 'chill the [defendants'] valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" (*Ketchum*, *supra*, 24 Cal.4th at p. 1131; see also *Liu v. Moore* (1999) 69 Cal.App.4th 745, 750 ["The purpose of section 425.16 is clearly to give relief, including financial relief in the form of attorney's fees and costs, to persons who have been victimized by meritless, retaliatory SLAPP lawsuits because of their 'participation in matters of public significance'"].) As we observed in *Del Rio v. Jetton* (1997) 55 Cal.App.4th 30, where we held that section 1988 does not preempt a claim for malicious prosecution brought by a party who prevailed on a section 1983 claim: "State law is preempted to the extent that it actually conflicts with federal law, as when it is impossible for a private party to comply with both state and federal requirements, or when the state law imposes an obstacle to the accomplishment of the will of Congress. [Citation.] No such obstacle exists in this case. Congress intended the fee-shifting provision in section 1988 to encourage plaintiffs to bring good faith civil rights actions, and to deter

61

plaintiffs from bringing civil rights actions which lack foundation." (*Id.* at pp. 36–37.)  The anti-SLAPP statute's mandatory fee provision is entirely consistent with that congressional intent.  In short, there is no federal preemption.

### 2.    *Duplicative Time*

The method for computing attorney fees for a successful anti-SLAPP motion is well established.  The court "begins with a touchstone or lodestar figure, based on the 'careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case.'" (*Ketchum, supra*, 24 Cal.4th at pp. 1131–1132.)  The fee award "should ordinarily include compensation for *all* the hours *reasonably spent*.'" (*Id.* at p. 1133.)  However, the court "must carefully review attorney documentation of hours expended; 'padding' in the form of inefficient or duplicative efforts is not subject to compensation." (*Id.* at p. 1132.)

The Supreme Court has instructed that "[t]he '"experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'" (*Ketchum, supra*, 24 Cal.4th at p. 1132.)  "'"A decision will not be reversed merely because reasonable people might disagree.  "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citation.]  In the absence of a clear showing that its decision was arbitrary or irrational,

a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not be set aside on review.' [Citation.]" Accordingly, an abuse of discretion transpires if "'the trial court exceeded the bounds of reason'" in making its award of attorney fees. [Citation.]' [Citation.]" (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 557 (*Premier Medical*).)

In the present case, plaintiffs try to avoid the deferential abuse of discretion standard of review by contending that the trial court failed to conduct the proper legal analysis in ruling on defendants' attorney fee motions because it failed to examine whether defendants sought fees reflecting duplicative efforts. (*569 East County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 434 ["the determination of whether the trial court *selected* the proper legal standards in making its fee determination is reviewed de novo [citation] and, although the trial court has broad authority in determining the amount of reasonable legal fees, the award can be reversed for an abuse of discretion when it employed the wrong legal standard in making its determination"].) However, the trial court's orders granting the attorney fee motions belie plaintiffs' assertion that the court failed to select the proper legal standards. In fact, in each order, the trial court noted its obligation to award fees only for the hours reasonably expended, and to reduce the award where an attorney's efforts were duplicative. And, in each order, the trial court excluded hours it concluded were unnecessary or duplicative.

63

That the trial court did not expressly state it was reducing the hours for which it awarded fees due to the fact that there were numerous arguments made by multiple sets of defendants is not evidence that the court did not apply the proper legal analysis. The court was not required to issue a statement of decision with specific findings, and "'"[a]ll intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown."'" (*Ketchum, supra*, 24 Cal.4th at p. 1140; see also *Rey v. Madera Unified School Dist.* (2012) 203 Cal.App.4th 1223, 1244 ["It is the trial court's role to examine the evidence and we presume the trial court performed its duty"].) In any event, plaintiffs' assertion that fees should not be awarded for hours expended on arguments when multiple defendants raised substantially similar arguments is not supported by law or logic. Plaintiffs cite to no case law, and we have found none, that holds a trial court is required to reduce an attorney fee award to account for arguments made by multiple parties represented by separate attorneys. Moreover, while some of the arguments made by the defendants may have been "duplicative," the work done by the attorneys for each set of defendants was not necessarily unreasonable. The attorneys for each set of defendants owed a duty to their clients, and to the court, to conduct their own analysis of the issues to ensure that the issues they raised had a basis in law and the facts.

The trial court was "'"the best judge of the value of professional services rendered in his court."'" (*Ketchum, supra*, 24 Cal.4th at p. 1132.) We have no cause to second guess its determination here.

### 3.    *Review of Investigative Records*

The OC defendants' attorney fee motion sought to recover fees for the hours their attorneys spent reviewing "voluminous documentation" from the OC district attorney's office.[13]  As one of the attorneys stated in his declaration filed in support of the motion, he "had to spend numerous hours reviewing the [district attorney's] extensive, four-year criminal investigation into Plaintiffs' illegal business practices . . . because the [district attorney's] investigation was the crux of Plaintiffs' [complaint], [and he] could not prepare an appropriate defense to Plaintiffs' allegations until [he] had comprehensively analyzed said investigation.  The expenses incurred reviewing this information was 'inextricably intertwined' with [the OC defendants'] anti-SLAPP motion, and necessary in order for [them] to succeed on such motion."

Plaintiffs argued in opposition to the OC defendants' motion that fees for the hours spent reviewing the OC district attorney's investigation should not be awarded because that review was not necessary to bring an anti-SLAPP motion.  The trial court addressed plaintiffs' argument in its order awarding fees.  It credited the OC defendants' attorney's statement that the review and analysis of the documents related to the OC district attorney's investigation was "inextricably intertwined" with the anti-SLAPP motion, and found that

---

[13]    This review of documentation was listed in a chart the OC defendants submitted in support of their motion, which set out the number of hours billed by each attorney every month, with a list of tasks for each month.  The review of documentation was one of many tasks listed in May 2018; one of the attorneys billed 23.4 hours that month, and the other attorney billed 51.5 hours.

billing for that review and analysis was not unreasonable or unrelated to the anti-SLAPP motion.

On appeal, plaintiffs contend the trial court's conclusion "'exceeded the bounds of reason' in the context of the legal ground advanced in the [OC defendants'] anti-SLAPP motion" because none of the OC defendants' legal defenses asserted in that motion had anything to do with the investigative files. It is not enough for plaintiffs to simply argue that the details of the OC district attorney's investigation was not necessary to the arguments the OC defendants made in the anti-SLAPP motion. Plaintiffs must make """"a clear showing that [the trial court's] decision was arbitrary or irrational"""" before we may conclude there was an abuse of discretion. (*Premier Medical*, *supra*, 163 Cal.App.4th at p. 557.) They have not done so here. Accordingly, we affirm the trial court's order.

//

//

//

//

//

//

//

//

//

**DISPOSITION**

All of the orders granting the special motions to strike and motions for attorney fees filed by defendants are affirmed. All of the defendants shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:


MANELLA, P. J.


COLLINS, J.

67